# 15 MAG 0871

DOC #

Approved: _____
SAMSON ENZER
Assistant United States Attorney

Before: THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

**ORIGINAL**

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA        :    **SEALED COMPLAINT**

            - v. -               :    Violations of
                                      18 U.S.C. §§ 111, 1951 and
                                 :    1956; 21 U.S.C. § 846
CESAR ESTRELLA,
JUAN MARTINEZ,
OSVALDO DELAHOZ, and             :    COUNTY OF OFFENSES:
BOANERGE CHEVALIER,                   BRONX

                                 :

            Defendants.          :

- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

KEVIN J. CONWAY, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

## COUNT ONE
### (Assault of a Federal Officer)

1. On or about March 17, 2015, in the Southern District of New York, JUAN MARTINEZ and OSVALDO DELAHOZ, the defendants, knowingly did forcibly assault, resist, oppose, impede, intimidate, and interfere with a person designated in Section 1114 of Title 18, United States Code, while engaged in and on account of the performance of official duties, and in the commission of those acts, inflicted bodily injury, to wit, MARTINEZ and DELAHOZ struck an undercover DEA agent in the course of forcibly robbing a backpack from the agent containing over $100,000 in cash proceeds from illegal drug trafficking.

(Title 18, United States Code, Sections 111(a) and (b).)

## COUNT TWO
### (Hobbs Act Robbery Conspiracy)

2.    On or about March 17, 2015, in the Southern District
of New York, CESAR ESTRELLA, JUAN MARTINEZ and OSVALDO DELAHOZ,
the defendants, and others known and unknown, unlawfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit robbery, as that term is defined
in Title 18, United States Code, Section 1951(b)(1), and would
and did thereby obstruct, delay, and affect commerce and the
movement of articles and commodities in commerce, as that term
is defined in Title 18, United States Code, Section 1951(b)(3),
to wit, ESTRELLA, MARTINEZ and DELAHOZ agreed to forcibly rob an
individual who was an undercover DEA agent of a backpack
containing over $100,000 in cash which represented proceeds from
illegal drug trafficking.

(Title 18, United States Code, Section 1951.)

## COUNT THREE
### (Narcotics Conspiracy)

3.    In or about March 2015, in the Southern District of
New York and elsewhere, BOANERGE CHEVALIER, the defendant, and
others known and unknown, intentionally and knowingly did
combine, conspire, confederate, and agree together and with each
other to violate the narcotics laws of the United States.

4.    It was a part and an object of the conspiracy that,
BOANERGE CHEVALIER, the defendant, and others known and unknown,
would and did distribute and possess with intent to distribute
controlled substances, in violation of Title 21, United States
Code, Section 841(a)(1).

5.    The controlled substances that BOANERGE CHEVALIER, the
defendant, conspired to distribute and possess with intent to
distribute were one kilogram and more of mixtures and substances
containing a detectable amount of heroin, and 500 grams and more
of mixtures and substances containing a detectable amount of
methamphetamine, in violation of Title 21, United States Code,
Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

2

**COUNT FOUR**
**(Money Laundering Conspiracy)**

6.    In or about March 2015, in the Southern District of New York and elsewhere, BOANERGE CHEVALIER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1) and 1957(a).

7.    It was a part and an object of the conspiracy that BOANERGE CHEVALIER, the defendant, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, to wit, illegal drug trafficking, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, illegal drug trafficking, and to avoid a transaction reporting requirement under State and Federal law, in violation of Title 18, United States Code, Section 1956(a)(1).

8.    It was further a part and an object of the conspiracy that BOANERGE CHEVALIER, the defendant, and others known and unknown, in the United States, knowingly would and did engage and attempt to engage in monetary transactions in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9.    I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I am currently assigned to the agency's New York Field Division ("DEA New York"). I am one of the agents with primary responsibility for the investigation of this case. This affidavit is based upon my own observations, my

3

conversations with other law enforcement agents and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

10.   In or about March 2015, I learned about an investigation by DEA's Miami Field Division ("DEA Miami") of a drug trafficking organization (the "DTO") with members in a variety of locations within and outside the United States, including in the New York City area. From my conversations with DEA Miami agents about the investigation of the DTO, I have learned, in substance and in part, that:   (a) the DTO distributes millions of dollars' worth of illegal drugs, including drugs that are transported across interstate lines; (b) the DTO recruits money launderers to transport or transfer cash proceeds of drug transactions for members of the DTO; and (c) as a security measure, DTO members will only provide such drug proceeds to a money launderer who provides a secret passcode that is known to DTO members.

11.   On or about March 17, 2015, DEA Miami agents provided me and other DEA New York agents with the telephone number for an individual believed to be a New York City based member of the DTO seeking a money launderer to transport drug proceeds (the "Target Phone Number"), and a secret passcode used by the DTO (the "Passcode").

12.   On or about March 17, 2015, in the morning, an undercover DEA New York agent, posing as a money launderer (the "UC"), called the Target Phone Number and participated in a telephone conversation with an individual later identified as BOANERGE CHEVALIER, the defendant. From speaking with the UC, I have learned that during this telephone conversation, the following took place, in substance and in part:

         a.   The UC provided the Passcode to CHEVALIER.

         b.   CHEVALIER said, in substance and in part, that he had about $100,000 in cash for the UC to pick up later on the same day.

4

      c.  CHEVALIER and the UC agreed to meet at a location in the Bronx, New York (the "Meeting Location") for the UC to pick up the cash from CHEVALIER.

     13.  On or about March 17, 2015, in the afternoon, the UC went to the Meeting Location to meet with BOANERGE CHEVALIER, the defendant. I and other DEA New York agents were in the area conducting surveillance of the meeting and of CHEVALIER. From my conversations with the UC, my surveillance, my conversations with other DEA agents and law enforcement officers, and my participation in the investigation of this case, I have learned the following, in substance and in part:

      a.  The UC and CHEVALIER met on the street at the Meeting Location and said the following to each other, in substance and in part. CHEVALIER said his apartment was nearby, and asked the UC to go with CHEVALIER to the apartment to get the cash that the UC had agreed to pick up from CHEVALIER. The UC declined to do so. The UC asked CHEVALIER to retrieve the cash from his apartment and bring it to the UC at the Meeting Location, and the UC said he would wait at the Meeting Location for CHEVALIER to do so. CHEVALIER complied with this request.

      b.  CHEVALIER walked into a nearby apartment building (the "Apartment Building"). A short time later, CHEVALIER exited the Apartment Building carrying a backpack that appeared to be stuffed with material (the "Backpack").

      c.  CHEVALIER reunited with the UC at the Meeting Location, and handed the Backpack to the UC. The UC peered inside the Backpack, and saw multiple bundles of United States currency tied with rubber bands inside the Backpack. CHEVALIER said, in substance and in part, that there was about $110,000 in cash in the Backpack.

      d.  The UC asked if CHEVALIER expected to have any more cash that CHEVALIER would want the UC to pick up from CHEVALIER. CHEVALIER said he would have more cash for the UC to pick up later in the week.

      e.  CHEVALIER walked away from the UC.

      f.  After the UC was robbed as described below, fellow DEA agents interviewed the superintendent of the Apartment Building from which CHEVALIER retrieved the Backpack of cash. The superintendent showed these agents video surveillance footage (taken by the Apartment Building's video camera system) of CHEVALIER exiting the Apartment Building with the Backpack at

around the time when CHEVALIER gave the Backpack to the UC at the
Meeting Location.  The superintendent identified CHEVALIER as the
tenant of a particular apartment in the Apartment Building
("Apartment-1").  These agents went to the Apartment-1 and knocked
on the door to Apartment-1, which was opened by a woman who
identified herself as CHEVALIER's wife.  The agents identified
themselves as law enforcement officers, and CHEVALIER's wife gave
the agents permission to enter Apartment-1.  During a subsequent
search that CHEVALIER's wife consented to orally and in writing,
the agents found, in the living of Apartment-1, a suitcase
containing:  (i) approximately two kilograms of substances that
field tested positive for the presence of heroin, (ii)
approximately one-and-a-half kilograms of substances that field
tested positive for the presence of methamphetamine, and (iii)
bundles of what appeared to be tens of thousands of dollars in
cash tied with rubber bands.

        g.   Shortly after the UC received the Backpack of cash
at the Meeting Location from CHEVALIER, the UC began walking away
from the Meeting Location with the Backpack.  While the UC was
walking away on a sidewalk in the area, a sport utility vehicle
(the "SUV") pulled up beside the UC and stopped.  The individual
later identified as CESAR ESTRELLA, the defendant, was in the
driver's seat of the SUV, and the individual later identified as
JUAN MARTINEZ, the defendant, was in a passenger seat of the SUV.
MARTINEZ exited the SUV, attacked the UC, the UC identified
himself as law enforcement, and MARTINEZ nonetheless tried to
forcibly take the Backpack from the UC.  While the UC struggled to
keep MARTINEZ from stealing the Backpack, an individual later
identified as OSVALDO DELAHOZ, the defendant, struck the UC from
behind.  OSVALDO or MARTINEZ wrestled the Backpack away from the
UC, and both OSVALDO and MARTINEZ got into the SUV with the
Backpack.  ESTRELLA sped away in the SUV with OSVALDO and
MARTINEZ.

        h.   A high-speed car chase ensued in which ESTRELLA,
OSVALDO and MARTINEZ attempted to flee in the SUV via the Henry
Hudson Parkway in the Bronx while law enforcement vehicles
followed.  During the chase, the SUV swerved erratically, rolled
over, and crashed.  Following the rollover, ESTRELLA exited the
SUV and ran away from the scene of the crash.  OSVALDO exited the
SUV and was apprehended by law enforcement officers as he
attempted to run away from the scene of the crash.  MARTINEZ was
apprehended by law enforcement officers in the SUV.

        i.   During a search of the SUV, law enforcement officers
found the Backpack of cash, and a New York State Driver's License

6

in ESTRELLA's name with a photograph of ESTRELLA (the "Driver's License Photograph"), among other things.

j.   On or about March 17, 2015, I and other DEA New York agents obtained subscriber information for a cellphone registered to ESTRELLA from the service provider for the cellphone, and toll records indicating that shortly after the car chase described above, in which ESTRELLA fled from law enforcement, the cellphone had been used to call a telephone number with a 212 area code, which I learned, from my review of law enforcement databases, is registered to an apartment in Washington Heights in Manhattan ("Apartment-2").

k.   I and other DEA New York agents went to Apartment-2. Several agents knocked on the door to Apartment-2, which was answered by a woman, who identified Apartment-2 as her apartment, and a young adult male whom she identified as her son.   After these agents identified themselves as law enforcement officers the woman gave these agents permission to enter Apartment-2.   The young adult male said his friend "Cesar" — which is ESTRELLA's first name — was sleeping in the back of Apartment-2.   Based on the woman's consent, I and other agents went to the back of Apartment-2 and found ESTRELLA there, who was placed under arrest. From comparing the Driver's License Photograph to ESTRELLA, I believe that the person depicted in the Driver's License Photograph and ESTRALLA are one and the same person.

14.   Following his arrest, I and other DEA New York agents interviewed CESAR ESTRELLA, the defendant.   At the outset of the interview, ESTRELLA was advised of his <u>Miranda</u> rights and agreed to waive those rights.   After waiving his <u>Miranda</u> rights, ESTRELLA stated the following, in substance and in part:

a.   On or about March 17, 2015, CESAR ESTRELLA, the defendant, drove the SUV with OSVALDO DELAHOZ and JUAN MARTINEZ, the defendants, to drop DELAHOZ off at a physical therapist in the Bronx.

b.   After dropping DELAHOZ off at his physical therapist, ESTRELLA drove the SUV with MARTINEZ to a nearby gas station to refuel the SUV.   While ESTRELLA and MARTINEZ were at the gas station, MARTINEZ said he saw what he believed to be some kind of transaction in which drugs or cash were about to be exchanged.   In ESTRELLA's presence, MARTINEZ called DELAHOZ's cellphone and told DELAHOZ to come out of the physical therapist's office because MARTINEZ and ESTRELLA were about to hit a bag.

      c.   ESTRELLA saw an individual (referring to BOANERGE CHEVALIER, the defendant) hand a backpack to another individual (referring to the UC).  ESTRELLA believed the backpack had either drugs or cash in it.

      d.   ESTRELLA drove the SUV beside the UC with MARTINEZ, who exited the vehicle and approached the UC.  DELAHOZ exited his physical therapist's office and approached the UC.  MARTINEZ and DELAHOZ stole the backpack from the UC and got into the SUV with the backpack.  ESTRELLA, MARTINEZ and DELAHOZ attempted to flee in the SUV.

      15.   From my conversations with the UC, I have learned, in substance and in part, that the UC suffered pain from being hit in the back and head during the above-described robbery, and sustained bruising, abrasions, and other injuries as a result of this robbery.

      WHEREFORE, I respectfully request that a warrant be issued for the arrest of BOANERGE CHEVALIER, the defendant, and that he and CESAR ESTRELLA, JUAN MARTINEZ and OSVALDO DELAHOZ, the defendants, be imprisoned or bailed, as the case may be.

                              KEVIN J. CONWAY
                              Special Agent
                              Drug Enforcement Administration

Sworn to before me this
18th day of March 2015

THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York